412 A.2d 222.

ANA DALOMBA SANTIAGO *vs.*
FAUSTINO GONSALVES SANTIAGO.

MARCH 7, 1980.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. Ana and Faustino Santiago were divorced by a decree entered in the Family Court on November 12, 1976. Faustino is before us on his appeal from a portion of the decree which directs the Family Court clerk to take approximately $3,750 that is presently on deposit in the court's registry and "pay [it] over to the State of Rhode Island." We shall first detail the reasons for the pay-over order and then discuss Faustino's jurisdictional challenge to its issuance.

Faustino and Ana were married in Seekonk, Massachusetts, on February 26, 1973. Their wedding license indicates that Faustino was a twenty-six-year-old native of the Cape Verde Islands who lived in Rotterdam, Holland, and worked as a seaman. The license also shows that Ana was a seventeen-year-old Cape Verdean native who resided in East Providence. Her occupation was described as "student." When Ana appeared before the Family Court on October 13, 1976, seeking a divorce on the ground of irreconcilable differences, there was another entry to be made concerning the couple's vital statistics: they were now the parents of a two-and-a-half-year-old daughter, Carlotta.

Much of the testimony presented at the Family Court was given by way of interpreters. Ana told the trial justice that she was then receiving from the Department of Social and Rehabilitative Services (DSRS) semimonthly payments for the support of herself and Carlotta. Each payment amounted to $117.

Somewhere in Faustino's testimony he let it be known that he had been injured aboard ship and received a "substantial settlement." The settlement, which had been effectuated through the efforts of a Boston law firm, had been dissipated. Faustino claimed that he had nothing left from the settlement. The trial justice, upon hearing this, directed Ana to return to the stand. Ana explained that in November 1974 Faustino had received by way of settlement a net amount of $33,000.

When the trial justice became aware that the couple had lived in a Central Falls tenement that was owned by Faus-

tino's brother, Liborio, the trial justice continued the hearing until the following November 8 and directed Ana's attorney to make sure that Liborio and Faustino's uncle, Jose Gonsalves, were present in court on that day and had with them all relevant documents relating to the settlement proceeds. The records further indicate that on this day the trial justice was told that contempt proceedings were to be instituted against Faustino pursuant to the pertinent provisions of the Uniform Reciprocal Enforcement of Support Act (URESA), G.L. 1956 (1969 Reenactment) §§15-11-1 et seq., because of his failure to comply with an order entered by a master, which order directed Faustino to pay $20 a week to DSRS as partial reimbursement for the assistance payments being made to Ana and the child. The trial justice ordered that the citation be issued returnable for the next hearing date.

On November 8 Liborio appeared and told the trial justice that Faustino arrived in Rhode Island on July 22, 1973, after spending ninety-five days in a Connecticut hospital for treatments relating to a broken leg. Liborio confirmed the fact that in the autumn of 1974 Faustino had received $33,000. Records of a Boston bank indicate that a joint bank account was opened in the names of Liborio and Faustino on October 7, 1974, with an initial deposit of $31,500. Liborio explained that on October 16 he withdrew $11,500 from this account, gave $7,500 of the withdrawal to his brother, and kept the remaining $4,000 as reimbursement for the various expenses he had incurred in his brother's behalf when Faustino was hospitalized. Liborio told the court that his brother then opened a savings account in a Pawtucket bank with a $3,000 deposit and "he keep the rest of the money in his pocket." According to Liborio, most of Faustino's cash found its way into barrooms "and other places." Liborio did acknowledge, however, that Faustino used some of the settlement proceeds to furnish the couple's tenement, purchasing such staples of the American way of life as a television set and "one stereo."

Uncle Jose brought a savings account passbook to court. The account stood in the names of Jose and his wife. Its balance on August 6, 1975, was $98.97. Thereafter, the

account received a substantial cash infusion, including two deposits that totaled $9,000. Jose conceded that Faustino was the infusion's donor. The account also shows a series of withdrawals so that, as of the day of the hearing, there was a balance in the account of $3,246.01. Jose testified that he made all the withdrawals and delivered them to his nephew.

As the trial justice examined the bankbook, he noticed that Jose had withdrawn $1,250 immediately prior to coming to court on November 8. When the trial justice asked Jose where the $1,250 went, Jose pointed to Faustino's attorney. At this juncture, Faustino's attorney informed the court that he and Ana's counsel had agreed that $1,250 was to be used for counsel fees, with Ana's attorney receiving $750 and the balance to be retained by him.

Thereupon, the trial justice, after alluding to Faustino's former testimony that he was penniless, directed Faustino's attorney to deposit the money allocated for fees into the registry of the court, and he also impounded Jose's bankbook. Ana's attorney was instructed to file a motion for counsel fees, but when Faustino's counsel asked if he could be included within the invitation, the trial justice said: "No, that doesn't go * * * for you, Mr. Kirshenbaum. You have been representing this man who had $33,000, and I would doubt very much that you would take him on unless you got a retainer from him at the time." Mr. Kirshenbaum responded that he had received "some money" but insisted, "I had a contract price with him."

When Faustino was recalled to the witness stand, he testified that the only remaining portion of the $33,000 settlement was the almost $4,500 that remained in Jose's bank account. He also explained that he was about to return to the Cape Verde Islands. Apparently, the Immigration and Naturalization Service had instituted deportation proceedings because Faustino had entered this country illegally. The trial justice compounded Faustino's woes when he found him in contempt and ordered him to be incarcerated at the Adult Correctional Institutions until Friday, November 12.

The first witness at the November 12 hearing was the Family Court's supervisor of collections from individuals who are required to reimburse DSRS pursuant to the terms of URESA. His records indicated that, taking into account the erratic weekly payments made by Faustino, there was a balance of $4,452.19 in support payments made for her and the child's benefit for which no reimbursement had been made.

Faustino was present at this time. When asked by the trial justice about the contract, he responded: "I do not have any contract with anyone. I only picked him as my attorney." Thereafter, the trial justice authorized the payment of a $750 fee to Ana's attorney, and he made certain findings of fact which are incorporated in the decree now under review.

As we proceed to the various facets of this appeal, we are reminded that at this point in time Faustino has returned to the Islands, and his trial counsel has retired from the practice of law and now calls Florida his home.

When the trial justice impounded Faustino's funds, including the $1,250 that the attorneys had agreed to share, there was then pending before the court Ana's divorce petition and her URESA petition. While Faustino's attorney insisted that there was an agreement regarding the fee, Faustino told the trial justice that there was no such agreement. We believe the question of any fee due Faustino's attorney, particularly in light of the contradictory testimony given by his client, was a matter addressed to the trial justice's discretion, and on this record we see no abuse of that discretion.

The state's right to the impounded funds presents a different issue. In challenging this right, Faustino's counsel points to §15-11-5 of the 1950 version of URESA, which in its pertinent parts provides: "For the purpose of this chapter, a husband in this state is hereby declared to be liable for the support of his wife if she is over fifty (50) years of age or physically incapacitated * * *." Faustino claims that there is no impoundment right because it is conceded that Ana is neither fifty years of age nor incapacitated. In taking this position, Faustino ignores the fact that §15-11-5 also imposes upon

him a duty to support "any child or children under eighteen (18) years of age * * *." He also overlooks §15-11-14, which recognizes the state's right to be reimbursed by a father for "expenditures" made by the state to support an individual who should have been receiving paternal support. Here, the state has been paying for Carlotta's support; each semi-monthly payment goes for the joint support of the mother and the child. If Faustino actually was seeking the benefit of the statutory over-fifty-years limitation, it was incumbent upon him to show what portion of the approximately $3,750 now in the registry was attributable to payments made for the support of the wife. At this late stage of the litigation, we are not about to undertake such an endeavor. Parenthetically, we would point out that the General Assembly at its January 1979 session, with the enactment of P.L. 1979, ch. 260, repealed in its entirety, as of July 1, Rhode Island's 1950 version of URESA and substituted therefor an updated and thoroughly revised version of the uniform act. No longer is a husband's duty to support his wife limited to spouses who are either over the age of fifty or physically incapacitated. Consequently, we cannot fault the reimbursement order.

The respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the case is remitted to the Family Court.

*Raymond E. Shawcross*, Chief Legal Counsel, Department of Social and Rehabilitative Services, for petitioner.

*Kirshenbaum & Kirshenbaum, Alfred Factor*, for respondent.